RENDERED: JUNE 16, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NOS. 2021-CA-0539-MR & 2021-CA-0854-MR

BENJAMIN G. DUSING                                    APPELLANT

APPEAL FROM KENTON FAMILY COURT
v.        HONORABLE CHRISTOPHER J. MEHLING, JUDGE
ACTION NO. 19-CI-00560

JILL BAKKER                                            APPELLEE

AND

NO. 2022-CA-0315-MR

BENJAMIN G. DUSING                                    APPELLANT

APPEAL FROM KENTON FAMILY COURT
v.        HONORABLE DENISE DEBERRY BROWN, SPECIAL JUDGE[1]
ACTION NO. 19-CI-00560

JILL BAKKER                                            APPELLEE

---

[1] Judge Brown was assigned to this case after Judge Mehling recused by Order dated November 4, 2021. The recusal was necessitated by the Appellant's profanity-laced threat on social media to "blow up" the opposing attorney and Judge Mehling's staff attorney, which we will discuss further herein.

<u>OPINION AND ORDER</u>
<u>AFFIRMING</u>

** ** ** ** **

BEFORE:  EASTON, GOODWINE, AND TAYLOR, JUDGES.

EASTON, JUDGE:  The underlying family court case is about a child ("L.D.").

The dispute over L.D.'s custody began even before L.D. was born.  Appellant

father, Benjamin G. Dusing ("Ben"), and the Appellee mother, Jill Bakker ("Jill"),

were never married.  Ben and Jill were engaged in 2018.  The engagement ended

before L.D. was born on April 12, 2019.

Ben is an attorney licensed in Kentucky and Ohio.  His Kentucky law

license was suspended on February 24, 2022.  His Ohio law license was suspended

shortly thereafter.  Throughout the underlying proceedings, Ben has represented

himself *pro se* but also with the assistance of multiple co-counsels.

Ben has filed numerous appeals from this case, but only three are

remaining.  They will all be addressed in this Opinion.  Case Nos. 2021-CA-0539-

MR and 2021-CA-0854-MR involve the Order entered on April 5, 2021, and have

been previously consolidated.  This Order followed a five-day hearing and decided

both custody and child support.  We will address these appeals jointly before

moving to the last of the three appeals, which we now order consolidated for a

single Opinion.

The last appeal involves an Order dated March 14, 2022, which decreased Ben's parenting time with L.D. and requires his visitation to be supervised. This action was in response to a motion filed by Jill, in which she claimed she feared for L.D.'s safety due to Ben's ongoing behavior. Ben argues this restriction of his parenting time was an abuse of discretion.

Our decision to address all three appeals together will include some repetition of the applicable standards of review, but the overall requirement for Ben to show factual findings to be clearly erroneous is worth repeating. This Court should not substitute its judgment but rather reviews the family court's decisions for clear error or abuse of discretion.

This case has a long history and has been exhaustively litigated. The record contains many thousands of pages. Mindful of Ben's criticisms of the family court, this Court has not taken days to review this case but instead engaged in months of work. We will discuss at some length the evidence in this Opinion.

Ultimately, and for the detailed reasons which follow, we conclude the family court had jurisdiction, the factual findings material to the custody (including the parenting time adjustment) and child support decisions of the family court are not clearly erroneous, and there was no abuse of discretion. We affirm the rulings of the Kenton Family Court.

Ben claims the family court made multiple errors in its Order of April 5, 2021. These allegations of error include 1) the family court lacked subject matter jurisdiction; 2) the family court abused its discretion in deciding custody and child support because it relied upon clearly erroneous factual findings; 3) procedural defects in the proceedings constitute reversible error; and 4) the family court committed reversible error by denying post-trial motions without a further hearing.

## FACTUAL AND PROCEDURAL HISTORY

Ben and Jill were in a relationship from mid-2017 until approximately a month before L.D. was born. Jill filed her Petition to Establish Custody and Paternity on April 8, 2019, prior to L.D.'s birth. This Petition was assigned Case No. 19-CI-00950. In the Petition, Jill states, "A minor child will be born of the parties in April 2019 and paternity has not been established." L.D. was born four days after the filing of the Petition. It is unclear on what date Ben was served with the summons for this case, but he filed his Response on May 2, 2019. In the meantime, on the day after L.D. was born, Ben filed a paternity action in the Kenton District Court. The district court case was assigned a "J" number by the clerk. Jill was served with Ben's district court paternity petition while she was still in the hospital recovering from L.D.'s birth.

-4-

On April 16, 2019, Jill filed a motion for a restraining order, a psychological evaluation, and a custodial evaluation. She asked the court for Ben to have no contact with her or L.D. until he had submitted to the psychological examination and custodial evaluations. In her affidavit, Jill alleged concerns about Ben's psychological health. Both parties were ordered to undergo custodial/parental evaluations, each with the professional of their choosing. They were then ordered to submit those reports to the court and to provide them to the other party.

For the next two years, a bewildering array of motions was filed by both parties in the family court case. At one point, the "J" paternity case and the "CI" custody action were consolidated, and pleadings and motions were filed with both case numbers. An order entered on December 30, 2019, directed that all future filings should be made in the custody "CI" case only. The parties were allowed an opportunity to request any documents in the "J" case to be sealed.

A temporary custody order had been entered in Ben's "J" case on May 23, 2019, granting Jill temporary sole custody of L.D. In an order dated April 25, 2019, Ben was granted supervised visitation only. On October 21, 2019, a temporary child support order was entered, in which Ben was obligated to pay $985.00 per month. On June 9, 2020, after a hearing on June 2, 2020, the family

court increased Ben's parenting time to include every other weekend, as well as one overnight during the week and one additional weeknight from 5:00-8:00 p.m.

For a variety of reasons, including the delays necessitated by the COVID-19 pandemic, the parties did not have a final hearing in this matter until February 2021. From the filing of the "CI" Petition to the final hearing, both parties filed multiple motions for contempt and sanctions against the other. Ben filed numerous motions to disqualify the presiding family court judge (all of which were denied). The final hearing was delayed several times, once due to one of the disqualification motions. The family court had to wait until the Chief Justice of the Kentucky Supreme Court ruled on the disqualification request, which was denied. Both parties filed motions to have the other party's counsel disqualified. Both parties filed motions to alter, amend, or vacate temporary orders. There were several "emergency" motions filed by both parties.

The final hearing was scheduled for February 22, 2021. Despite Ben's motions to continue this hearing filed on January 19, 2021, and February 19, 2021 (both were overruled), the family court held a hearing on February 22, 23, 25, and 26. For completion, the family court had to add another day. The fifth day of the hearing was on March 11, 2021.

Jill put on her case first. She called Dr. Jean Deters, Joanne Forsthoefel, LPCC (Licensed Professional Clinical Counselor), Dr. David

-6-

Feinburg, Dr. Ed Connor, Detective Jill Stulz, Andrew Dusing, Julie Tapke, and Tina DeAngelis as witnesses. Jill also testified. We will summarize the testimony.

Dr. Jean Deters was Jill's first witness. Dr. Deters is a psychologist. Jill was referred to her for a psychological evaluation, and her report was completed in October 2019. Dr. Deters diagnosed Jill with post-traumatic stress disorder ("PTSD"). She further identified the source of Jill's PTSD as her relationship with Ben, which she categorized as coercive and abusive in nature. In making that determination, Dr. Deters spoke with Jill at length. She also reviewed many of the text messages, emails, and voicemails Ben sent to Jill throughout the relationship and after the relationship ended. Dr. Deters opined Jill will not be able to fully recover from her PTSD if she must continue to interact with Ben.

Jill's second witness was Joanne Forsthoefel. She provided counseling to Jill. Like Dr. Deters, Ms. Forsthoefel diagnosed Jill with PTSD. She categorized Jill's PTSD as "severe." She also believes the source of Jill's PTSD was her relationship with Ben. Forsthoefel observed Jill's high levels of anxiety. Jill had trouble eating and sleeping, possesses an exaggerated stress response, and has intrusive thoughts, nightmares, and flashbacks. These symptoms occur any time Jill is reminded of her past trauma, which occurs with anything connected with Ben. Forsthoefel acknowledged on cross-examination she has never met Ben

and all her information used to form the basis of her opinions was obtained from Jill's subjective reports.

Dr. David Feinburg testified next for Jill. Dr. Feinburg is a psychologist who performed several psychological tests on both parties. He testified he spent approximately 9 to 9.5 hours with each party. He reviewed some records provided by the parties, and he interviewed Jill's two older children as well as Jill's boyfriend at the time of the evaluations. Dr. Feinburg testified he was unable to interview Ben's children because Ben's ex-wife, Julie, would not consent to the interviews.

Dr. Feinburg was previously involved in Ben's other custody action with his ex-wife, Julie. Dr. Feinburg completed a parenting evaluation on Ben in 2016. He performed a second parenting evaluation in 2020. Dr. Feinburg saw greater disturbances in Ben's thinking in 2020 than in 2016. Ben demonstrated anger, paranoia, difficulty with authority, mistrust, suspicion, and a lack of empathy. Dr. Feinburg recommended that Jill be granted sole custody of L.D., with Ben having supervised visitation only until there is a record that L.D. would be safe in his sole custody.

Jill's fourth witness was Dr. Ed Connor. Dr. Connor was initially hired by Ben to do his custodial evaluation. Dr. Connor testified that his report was completed around May 20, 2020, with an addendum being completed on July

15, 2020. Dr. Connor conducted testing on both parties, as well as reviewed documents provided by the parties, and performed several interviews. Dr. Connor observed indications of PTSD with Jill. He additionally gave his opinion that Ben showed a personality style that was self-centered, turbulent, histrionic, and narcissistic. His recommendation was like Dr. Feinburg's in that he believed Jill should be granted sole custody and be the primary residential parent, with Ben to receive visitation.

Dr. Connor additionally testified that Jeff Otis, one of Ben's co-counsels, came to his office and offered him $5,000.00 to state that his report was not complete. After he sent his report to Ben's counsel, he received a letter from Mr. Otis stating they were "pulling the plug" on his evaluation. Despite this letter, Dr. Connor was given additional information, which led to his addendum.

Jill called Detective Jill Stulz as her next witness. Detective Stulz is a detective with the Fort Mitchell Police Department. She testified she is familiar with Jill and Ben. Ben first reported in May 2019 he wanted to file a report regarding extortion. Ben explained Jill was attempting to extort money from him. Ben initially did not want to pursue an investigation, but he later returned and did want to pursue charges. Detective Stulz said she gave the information to the Commonwealth's Attorney, who declined to prosecute.

Detective Stulz additionally testified that Jill spoke with her about pursuing charges for harassing communications.[2] Jill provided her with emails and text messages she received from Ben. This information was given to the Boone County Attorney. Detective Stulz testified that no charges were brought because this information was already being addressed in this civil matter.

Jill's sixth witness was Andrew Dusing. Andrew is Ben's brother. Andrew talked about Ben's turbulent relationship with his family. Andrew additionally explained he does not allow his children to be around Ben without another adult being present. Andrew testified he does not communicate much with Ben, because Ben is generally unkind and unpredictable, and conversations with him are not productive.

Jill's next witness was Julie Tapke, Ben's ex-wife. Julie and Ben have three minor children, with joint custody, although Julie currently has sole decision-making authority regarding the children's medical, educational, and other activities. Julie testified co-parenting with Ben is very challenging and difficult. She explained that prior to her having sole decision-making authority, Ben would use the children's activities as a negotiating tool. This led to the children being anxious about whether Ben would agree to allow them to participate in activities. Julie said that since she was awarded sole decision-making authority over those

---

[2] Kentucky Revised Statutes ("KRS") 525.080, a Class B Misdemeanor.

-10-

areas, the children have shown a decrease in anxiety; now there is consistency and reliability.

Jill testified as her final witness in her case in chief. Jill said she has a healthy co-parenting relationship with her ex-husband, and they have joint custody of her older children with close to equal timesharing. Jill recounted she and Ben began dating in July 2017. She stated the relationship moved quickly, and they became engaged in March 2018. In mid-August 2018, she discovered she was pregnant with L.D.

Jill said her relationship with Ben was very abusive, although it didn't start that way. In the beginning, Ben would send very flattering messages, stating how great she was and how lucky he was. He messaged her constantly, and as time went on, those messages became longer and more frequent, and she felt pressured to respond in the same manner. Their arguments in the beginning were superficial, but Jill explained they got worse over time. Jill believed Ben blamed her for everything, and she began to change the way she reacted to him to give him what he said he needed.

Jill testified they got engaged in March 2018. Ben wanted to do everything together. Ben complained Jill wasn't doing enough for him or giving him enough attention. She thought nothing she ever did was enough, and she began to cancel time with family and friends to spend all her time with Ben.

Jill talked about the communications Ben sent her becoming increasingly longer and more hostile. She told about a time she went on vacation with her older daughter. Ben constantly messaged her while she was there. Jill's daughter sent him a picture of Jill playing volleyball on the beach in a bikini. Ben responded by calling Jill names such as "slut" and "whore" and stating how embarrassing the pictures were. Ben demanded Jill delete them.

Jill recalled they started to move in together around April to May 2018. She testified Ben would kick her out of the house when he got angry with her. She described Ben conducting "white board sessions" with her in his office. On one occasion, Ben wrote on this white board specifics of how Jill was to treat him or speak to him after they had a fight. Ben told her to take a picture of the board to remember what to say when Ben was upset with her. This picture was admitted into evidence on the third day of their hearing. At the top of the white board the words "Shut Up Jill" were written.

Jill testified that after she and her children began staying with Ben more often at his house, he began to pressure her to sell her house. She also said he wanted to combine all their bank accounts into a joint account. Jill hesitated to do this because of how tumultuous the relationship was by that time. Jill now believes Ben wanted access to her funds as another way to control her.

Jill told about an incident on August 2, 2018, which was the reason for her and her children to move out for good. Jill explained she and Ben fought throughout the day. That evening, after the children went to bed, Ben threw a mug across the yard and shattered it. Ben poured water over her head. Jill testified Ben was yelling for her to leave, and Jill begged to let them stay the night so she wouldn't have to wake up the children.

Jill said the fight continued upstairs. Ben grabbed her and pushed her. She then went into the closet in the bedroom. Ben followed her and slammed her head into the wall. Jill and the children left the next morning. A few weeks later, Jill discovered she was pregnant with L.D.

Jill received a handwritten letter from Ben in mid-August, where he apologized for the August 2 incident. Jill said the emotional and psychological abuse continued throughout her pregnancy. Ben would leave long insulting voicemails on her phone. She blocked him several times, but that just intensified the verbal abuse. Jill played several of these voicemails to the family court. Some of the voicemails were directed to the unborn baby. Ben called them "baby sermons." These sermons included name-calling, telling the baby he's sorry her mother is "total garbage," telling her to "get out of that serpent belly," and "get the hell out of that demon."

Jill described how she had high blood pressure throughout the pregnancy, especially toward the end. At one point she ended up in the emergency room. Ben came to the hospital to see her while she was in the hospital. Ben sent her a very long email after that incident in which he stated how ungrateful she was that he came to the hospital to check on her and the baby.

Jill went into labor on April 12. Jill stated she notified Ben via text message. Ben came to the hospital, and she allowed him into the room about an hour after L.D. was born. Jill asked the nurse to remain in the room while Ben was there, which she did.

Jill testified abusive messages from Ben continued after L.D. was born. She talked about multiple messages to her reading "I could kill you," or "I want to kill you." Jill entered a summary into evidence of all the times Ben made references to killing her.

Jill worries about L.D. when she is with Ben. Jill said L.D. has come back from Ben's on multiple occasions in a dirty diaper, in a wet swim diaper, and with severe diaper rash. L.D. once returned with a severe sunburn. Ben has denied this, and he claimed that Jill altered the photograph to make it look like L.D. was sunburned when she was not. Throughout this case, Ben accuses Jill of "altering" evidence with no substantial evidence to support the accusation.

-14-

Jill asked the family court to grant her sole custody of L.D. with Ben to have only supervised visits and no overnights. Jill also asked the court to require Ben to do a medication review and go to therapy. At the end of Jill's testimony, Ben advised the family court he did not wish to subject Jill to cross-examination, and he did not.

The hearing then shifted to Ben's case. Ben called Adam Basinger, Adam Davey, JoAnne Roth, Robert Bryson, Darlene Taylor, Steve Epplen, Zachary Peterson, K.J. Jhaveri, Dr. Andrew Klafner, and Dr. Stuart Bassman as witnesses. Ben also testified.

Ben's first witness was Zachary Peterson. He is an attorney who has worked with Ben for several years. He stated he was involved in a multiweek trial with Ben in November-December 2018. He said Jill was texting Ben a lot during this trial, and he was concerned Ben was getting distracted. Peterson explained he has been to Ben's home, and he has been around Ben and his children. He also told the court he has seen Ben with L.D., and he said the two had a very strong bond. On cross-examination, Peterson stated he did not know the content of the text messages between Jill and Ben. He also stated he did not have any concerns about Ben's mental health during the trial in 2018.

Ben's next witness was Steve Epplen. He has known Ben since high school. He has also coached several of the children's teams with Ben. Ben was very positive when coaching the children. Ben was always great with the children.

Ben next called Robert Bryson. Their sons are very good friends, and they have coached children's sports together. He testified Ben creates a good environment for the children they coach, and Ben is very supportive and very generous with his time. He has always known Ben as a good, involved, attentive father. He has witnessed Ben with L.D., and he saw him as a caring, attentive father with her.

Ben's next witness was K.J. Jhaveri. They are very close friends. Their children are the same age. He believes Ben is a loving father who goes out of his way to make sure his children are cared for. Ben is the godfather of Jhaveri's son. He chose Ben for this role because he wanted someone who was a good role model. He has no concerns about Ben as a dad, and his son regularly stays over at Ben's house. He and his wife hosted a baby shower for Ben and Jill.

Ben's fifth witness was Adam Davey, who is Ben's accountant. He testified he prepared Ben's 2019 tax return. This included the year Ben left his previous law firm and went back to his own firm, named BGD Law. Davey stated Ben's 2019 adjusted gross income for that year was $201,957. He also stated that $77,697 of that amount was a return of capital from the previous firm. Ben did not

receive the full amount in 2019 because the payments were to be spread out over three years; however, he had to claim it all in one year. Davey explained Ben's income after deductions and adjustments in 2019 was $111,385.

On cross-examination, Davey testified the return of capital amount was how Ben and the firm characterized it; he has no independent verification of this. Davey also admitted that in 2018, Ben's total adjusted gross income was $442,158. In 2017, it was $733,985. Davey said Ben's income varies greatly from year to year, especially when working on his own.

Ben's sixth witness was Adam Basinger. He is an employee of Ben's, both at the former law firm and now at Ben's firm. He is employed as a law clerk at the firm, and he also works for Ben personally, as a general assistant. He testified he has been around Ben with his children, and that he's "the best dad he can be." Basinger assists Ben with his accounting at the law firm, and he testified Ben's net income for 2020 was "somewhere in the 70's." This information had not yet been given to the accountant.

Basinger informed Ben he was concerned about some large purchases Jill was making when they were living together. On cross-examination, he recalled Ben asking him to get Jill a BGD Law credit card. He also testified he was involved in picking up and dropping off L.D. and recording those interactions. He

-17-

was unaware of any court order regarding exchanges. He testified Ben wrote him a recommendation letter for admission to law school.

Ben's next witness was JoAnne Marie Roth. Roth is Ben's maternal aunt. She testified Ben is a good dad, who is attentive, fun, and loving. She has never had any concerns about the safety or well-being of the children with him.

Ben's eighth witness was Darlene Taylor. She is a friend of Ben's who has witnessed him with his children. She testified Ben is a fun dad who is very bonded with his children. She stated she has never met L.D. or seen Ben with her.

Ben testified next. He stated he and Jill met through their children's sporting events. While the relationship moved quickly, Ben did not believe it was too quick, because they discussed everything thoroughly. He believed the relationship was healthy at first. He stated one of the reasons they agreed to move in together was so her children could start a new school at the beginning of the year, and he lived in a good school district. Ben believed Jill would cut down to working three days a week and become the "house CEO" so he could be the main breadwinner. According to Ben, they made that decision together.

Ben explained his house needed renovating due to adding three more people to the home. He initially intended to pay for everything, but a large tax bill came unexpectedly. The plan was to accelerate the timeline of Jill selling her

house to help pay for that. This created a problem because Jill didn't want to do that. Ben said daily life together was an adjustment, and Jill didn't want to follow through on that commitment.

Summer of 2018 became difficult because Ben felt spending was getting "out of control." Ben stated his and Jill's parenting and spending styles were very different, and it was causing problems. They were not a common unit, and this worried him because there was disparity between how the sets of children were treated. Ben didn't feel Jill was living up to the commitments they made. Their arguments became more intense.

Regarding the August 2 incident Jill testified about, Ben stated there was conflict that night, and he wishes things had gone differently. Ben testified he recorded the conversation on his phone, yet he did not play that recording or introduce it into evidence. Ben said Jill got physical with him at some point, and he felt she was trying to provoke an incident. He stated they both acted "in the heat of the moment." The next day, they all went together to a concert with the children. Ben did not deny writing the letter apologizing for the incident, but he denied that it was an admission of physical violence.

Ben ended the engagement at some point, but Jill would still sometimes wear the ring for things to appear normal and to keep people from

asking questions.  On one occasion, Jill threw her engagement ring across the driveway, and they then had to dig it out of the grass.

Ben testified to an incident where Jill drove to his home with her children, and she appeared intoxicated.  Ben said this was concerning to him, both because her children were in the car with her, and because she had told him she thought she may be pregnant.  At this point Jill had not had a positive pregnancy test.  Ben agrees there was a lot of communication between them during this time.

Ben remembered that two days after he ended the engagement, Jill called him to say she had a positive pregnancy test.  They decided they needed to tell their children at the same time.  Ben later discovered Jill's children were made aware of it before he had the opportunity to tell his children.  Ben was very upset with Jill for this.

Ben said he went to almost all of Jill's doctor's appointments, up until the eighth month of her pregnancy.  He was continually trying to communicate with Jill.  Ben admitted some of his messages to her were not how you should speak to someone, but he was very upset because he wanted to determine how they were going to move forward.  Ben wanted Jill to sit down and talk with him, and he testified she wouldn't do that.  He felt like Jill was using the pregnancy as a weapon.

Ben told Jill he wanted to be totally involved in the baby's life. He was surprised when Jill took that as bad news, and "everything changed overnight." He wouldn't hear from her for days, and she blocked his texts. Jill suggested he waive his parental rights, which he knew was not the right thing to do. Ben felt like he was being extorted. He believed Jill wanted money and for him to stay out of their lives.

Ben testified that on March 7, 2019, he received a message from Jill that she was not going to speak with him any longer. He said he was "a wreck." He did not hear from her again until the afternoon of April 12, when L.D. was born. Ben filed a paternity action, not knowing Jill had already filed a custody case.

Ben initially had been granted only supervised visitation. After a prior hearing, Ben had been given unsupervised visitation. Jill was granted temporary sole custody. In June 2020, Ben testified he was granted additional parenting time. Ben asked the court for joint custody and equally shared parenting time. He proposes a week on, week off schedule.

Ben feels every communication with Jill is a trap. He believes it's to get him to do something to violate a court order. It became clear to Ben that Jill and his ex-wife began coordinating with one another. Ben described Jill as very jealous. She would become jealous over his friendships with other women. Jill

would run hot and cold with him. Ben also was concerned about Jill's use of alcohol.

Ben testified Jill would make $91,000 annually if she worked full time. He also believes he's been overpaying child support since the beginning. He entered a work sheet showing what he believes is the correct amount of child support. At this point in the testimony, the family court was informed Ben had not turned over his tax returns to Jill's counsel in discovery.

After Ben completed his testimony, he called Dr. Andrew Klafner. Dr. Klafner has been Ben's psychiatrist since 2014. He writes Ben his Adderall prescription for ADHD. Dr. Klafner has met with Ben about every other week for the past three years. In March 2019, he wrote a letter advising Ben to reduce his workload for his mental and physical health. Dr. Klafner has not seen Ben with his children. He has never met Jill. He has not reviewed any of the other expert reports submitted to the court.

Ben's final witness was Dr. Stuart Bassman. Ben was sent to Dr. Bassman for a psychological evaluation in the custody case with his ex-wife. The purpose of that evaluation was to determine if there was any personality disorder, psychosis, mental health issues, or anything that would impair Ben's functioning. Dr. Bassman testified he found no evidence of a psychological disorder. Dr.

Bassman explained his role had nothing to do with a parental evaluation, and so he did not speak with any of the children.

Jill called Tina DeAngelis as a rebuttal witness. Ben continually denied in his testimony that Ben and Tina DeAngelis had been in a romantic relationship. Ben also denied DeAngelis ever took care of L.D. DeAngelis testified she had previously been in a relationship with Ben. They ended the relationship because Ben began a relationship with his attorney at the time of the hearing (a relationship they both denied). DeAngelis also stated while she and Ben were dating, she acted in a caretaking role for L.D. She also recalled overhearing a conversation between Ben and Jeff Otis, where Ben discussed sending Jeff to "manage Dr. Connor." This provided some level of confirmation for the alleged offer of $5,000 made by Jeff Otis to Dr. Connor.

At the conclusion of the hearing, the family court advised the parties to file final memos by March 29 by 3:00 p.m. The resulting Order is the subject of the first two appeals. We will next address the overarching claim about subject matter jurisdiction as to all appeals.

## SUBJECT MATTER JURISDICTION OF THE FAMILY COURT
## STANDARD OF REVIEW

Subject matter jurisdiction is a question of law, and therefore the appellate standard of review is *de novo*. *Basin Energy Co. v. Howard*, 447 S.W.3d 179, 184 (Ky. App. 2014).

-23-

# ANALYSIS

Ben claims all the family court's orders in this action are void *ab initio* because the family court lacked subject matter jurisdiction. He argues because Jill filed her Petition to Establish Custody and Paternity prior to the birth of the child, the family court did not have jurisdiction to hear the "CI" case.

Ben is correct that a court's decision cannot stand if it does not have subject matter jurisdiction to hear a case. "If an administrative body or court acts outside its general authority, any action it takes is considered void *ab initio*. It has no effect because a court or administrative body only has the power to act within its general jurisdiction. The parties cannot confer jurisdiction by waiver where none existed in the first instance." *Id.* at 187.

Ben conflates personal jurisdiction with subject matter jurisdiction. Ben does not contend that the family court did not have general jurisdiction over this type of case, that is, child custody. The type of case which may be heard is the measure of subject matter jurisdiction. *See Masters v. Masters*, 415 S.W.3d 621 (Ky. 2013). The jurisdictional basis of child custody is governed by KRS 403.822, which states:

> (1) Except as otherwise provided in KRS 403.828, a court of this state shall have jurisdiction to make an initial child custody determination only if:
>
> (a) This state is the home state of the child on the date of the commencement of the proceeding, or was

> the home state of the child within six (6) months before the commencement of the proceeding . . . or
>
> (b) A court of another state does not have jurisdiction under paragraph (a) of this subjection . . . .

Ben insists because there was no child born when Jill's petition was filed there was no subject matter jurisdiction. The absence of a child for which to decide custody would be a lack of personal jurisdiction, but this does not equate with a lack of subject matter jurisdiction. Despite Jill's early filing of her petition, the family court had subject matter jurisdiction when it acted in this case.

KRS 403.150(1) states that all proceedings under the KRS Chapter governing child custody are commenced in the manner provided by the Kentucky Rules of Civil Procedure. CR[3] 3.01 states, "A civil action is commenced by the filing of a complaint with the court **and** the issuance of a summons or warning order thereon in good faith." (Emphasis added.)

While Jill may have filed the custody petition four days prior to L.D.'s birth, the record confirms a summons was not issued until April 15, 2019, three days **after** L.D.'s birth. Thus, the action was not commenced until the summons was issued after L.D. was born. *See Wooten v. Begley*, 305 S.W.2d 270, 271 (Ky. 1957). "In construing these provisions respecting the commencement of a suit against a known resident, we have held that merely filing a petition with the clerk

---

[3] Kentucky Rules of Civil Procedure.

of the court is not sufficient, but the summons must have been caused to issue in good faith." *Louisville & N.R. Co. v. Little*, 95 S.W.2d 253, 254 (Ky. 1936).

Ben's jurisdiction argument fails for another reason. He argues in his brief that "there is no authority in this (or any other) jurisdiction for the proposition that a court has subject matter jurisdiction over paternity actions commenced *before* there is a 'paternity.'"[4] However, this Court disagreed with that contention in *Gullett v. Gullett*, 992 S.W.2d 866 (Ky. App. 1999). In *Gullett*, this Court allowed Kentucky to retain jurisdiction over child custody when a petition for dissolution of marriage was filed two weeks prior to the child's birth, when the mother moved to Ohio prior to giving birth to the child. *Id.* at 871.

While Ben argues that a court cannot have jurisdiction over a child who has not yet been born, Ben himself filed a paternity action immediately after L.D. was born recognizing the authority of the courts then to decide custody. The "CI" and "J" cases were even consolidated for a time. In any event, the family court here did not issue any orders regarding custody or paternity of the child prior to the child being born. The petition was merely filed before the child was born.

The Kenton Family Court had both subject matter and personal jurisdiction to decide the custody of and child support for L.D. Both parents reside

---

[4] Appellant Brief, Page 4.

in Kentucky, and L.D. has always resided in Kentucky.  We next consider the custody determination made by the family court.

## AWARD OF SOLE CUSTODY
## STANDARD OF REVIEW

Appellate review of custody awards is for abuse of discretion. *Gertler v. Gertler*, 303 S.W.3d 131, 133 (Ky. App. 2010). "The test for an abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound reasonable principles." *Penner v. Penner*, 411 S.W.3d 775, 779-80 (Ky. App. 2013).  We are allowed to set aside the trial court's factual findings only if they are clearly erroneous.  *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003).  Findings of fact are clearly erroneous when they are not supported by substantial evidence.  *Id.* "Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion and evidence that, when taken alone or in the light of all the evidence, has sufficient probative value to induce conviction in the minds of reasonable men." *Id.* (internal quotation marks and citations omitted).  Due regard must be given when the trial court assesses witness credibility.  CR 52.01.

## ANALYSIS

Ben alleges the family court abused its discretion in its award of sole custody of L.D. to Jill.  Ben claims the family court's ruling was error because it was based solely on its finding that Ben domestically abused Jill.  He alleges first

that the court's finding of domestic abuse was erroneous, and second, the family court failed to consider the remaining factors outlined in KRS 403.270.

Ben first argues the family court's finding that domestic abuse occurred was erroneous. Domestic abuse is defined in KRS 403.720(2) as "[p]hysical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members or members of an unmarried couple[.]"

The family court made several findings that Ben subjected Jill to domestic violence. It found "Respondent has perpetrated violence on Petitioner when they were still in a relationship. These incidents included biting her face, spitting on her, barricading her in a closet, hitting her head on a wall, pinching, and throwing food, water, and other objects at Petitioner. In a letter dated August 7, 2018, Respondent admitted that he was physical with her. P. Ex. 32 at 853. He also sent thousands of written messages via text and email that are emotionally abusive. He also left multiple voice mails with petitioner with the same effect."[5]

As to this fact finding, Ben insists: "Incorrect. Respondent's correspondence makes no such admission and speaks for itself. Also directly

_____

[5] Findings of Fact, Conclusions of Law, Orders and Judgment of Custody, April 5, 2021, Paragraph 7.

-28-

contradicts only record testimony regarding the correspondence."[6] This Court is in possession of Jill's Exhibit 32, Ben's handwritten letter, entered as evidence at the hearing. Jill testified to this letter in the hearing. This letter does, in fact, state, "I f*cked up, my love. The pressure of creating this life, and this family, got to me. There is no excuse. None. For showing/saying hostility in front of the kids. For being physical with you when you asked me not too. For sending you a message that was, in a word, simply unacceptable."[7] Despite Ben's testimony that this letter didn't say what it appears to say, it was not clearly erroneous for the family court to believe Jill's version of the events.

Another example of a pertinent finding of fact is in Paragraph 13 of the Order which states, "Respondent also intimidated in other ways. He threatened petitioner that he would tell her daughter that her marriage ended because she had an affair. He threatened to email her parents (which he did)."[8] In Ben's later filed "chart" of his factual error claims, Ben states about this finding: "Incorrect. Respondent has never one single time emailed Petitioner's parents. Petitioner never contended that he did. There is no evidence in the 4500-page documentary

[6] Exhibit A, Paragraph 7, attached to Motion for Relief from Judgment on Grounds of Fraud Affecting the Proceedings Pursuant to KRCP 60.02(d), filed 6/18/2021.

[7] Petitioner's Exhibit 32, Page 4.

[8] Findings of Fact, Conclusions of Law, Orders and Judgment of Custody, April 5, 2021, Paragraph 13, Page 4.

record in this case that he did."[9]  On the contrary, Petitioner's Exhibit 31 is a series of texts Ben sent to Jill's family, which supports Jill's testimony that Ben both threatened and did send messages to her parents.[10]

The family court committed no error on relying on Jill's evidence when documentary evidence supported Jill's version of events and contradicted Ben's assertions.  "[W]hen the testimony is conflicting we may not substitute our decision for the judgment of the trial court." *R. C. R. v. Commonwealth Cabinet for Hum. Res.*, 988 S.W.2d 36, 39 (Ky. App. 1998).  Regardless of how Ben characterized his letter of August 7, 2018, the letter does in fact make an admission that he was "physical with her."[11]  Additionally, the family court found on at least six occasions, Ben made written references to killing Jill.[12]  The family court's findings are not clearly erroneous.

Ben also argues the family court abused its discretion in determining the presumption of joint custody and equally shared parenting time had been rebutted by its finding of domestic abuse when all factors of KRS 403.270 must be considered.  KRS 403.270 is the controlling statute in determining child custody.

[9] Exhibit A, Page 5, Record on Appeal 2843.

[10] Hearing, 2/25/2021 at 4:14:17 and 5:01:38.

[11] Petitioner's Exhibit 32, Page 4.

[12] Findings of Fact, Conclusions of Law, Orders and Judgment of Custody, April 5, 2021, Paragraph 11.

"The statutory guidelines of KRS 403.270 do not include a definition of the best interests of the child standard; however, KRS 403.270(2) requires the trial court to consider all relevant factors and provides a list of non-exclusive, demonstrative factors to be considered in custodial determinations." *Frances v. Frances*, 266 S.W.3d 754, 756 (Ky. 2008).

KRS 403.270(2) states as follows:

The court shall determine custody in accordance with the best interests of the child and equal consideration shall be given to each parent . . . there shall be a presumption, rebuttable by a preponderance of the evidence, that joint custody and equally shared parenting time is in the best interest of the child. If a deviation from equal parenting time is warranted, the court shall construct a parenting time schedule which maximizes the time each parent or de facto custodian has with the child and is consistent with ensuring the child's welfare. The court shall consider all relevant factors including:

(a) The wishes of the child's parent or parents as to his or her custody;

(b) The wishes of the child as to his or her custodian, with due consideration given to the influence a parent may have over the child's wishes;

(c) The interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may significantly affect the child's best interests;

(d) The motivation of the adults participating in the custody proceeding;

(e) The child's adjustment and continuing proximity to his or her home, school, and community;

(f) The mental and physical health of all individuals involved;

(g) A finding by the court that domestic violence and abuse . . . has been committed by one (1) of the parties against a child of the parties or against another party. The court shall determine the extent to which the domestic violence and abuse has affected the child and the child's relationship to each party, with due consideration given to efforts made by a party toward the completion of any domestic violence treatment, counseling, or program;

(k) The likelihood a party will allow the child frequent, meaningful, and continuing contact with the other parent . . . except that the court shall not consider this likelihood if there a finding that the other parent . . . engaged in domestic violence or abuse . . . against the party or a child and that a continuing relationship with the other parent will endanger the health or safety of either that party or the child.

In addition to its finding of domestic violence against Jill, the family court found that other family members have witnessed or been the subject of Ben's hostility, including his ex-wife and his brother. Ben's ex-wife, Julie, testified that Ben's actions cause anxiety in his three older children, and cited multiple examples of this occurring. Both Dr. Feinburg and Dr. Connor recommended to the court that Jill be granted sole custody of L.D., as they do not believe Ben can successfully co-parent with Jill. The family court found Dr. Feinburg to be a

-32-

credible witness and accepted his testimony that "as this child gets older and seeks some form of independence; she will clash with respondent's parenting style."[13]

The family court made a total of 111 findings of fact. While not specifically attaching each finding to one factor in KRS 403.270, we conclude the family court took all relevant factors of the statute into account when making its ruling. The factual findings of the family court are more than adequate to show the family court considered all the statutory factors, and the facts considered support the exercise of the family court's discretion to award Jill sole custody of L.D.

We find some of the circumstances of this case analogous to those of *Gertler*, *supra*, in which we upheld the circuit court's award of sole custody. In *Gertler*, the circuit court found the father would be unable to cooperate with the mother in reaching decisions affecting the children's educational, religious, and medical needs. 303 S.W.3d at 137.

"While joint custody should not be automatically rejected where parents cannot cooperate at present, especially if they are in the midst of a divorce, joint custody can be appropriate if it appears that with time parents will be able to achieve an acceptable level of cooperation. An award of sole custody is proper when a parent cannot cooperate in making joint decisions affecting the children

---

[13] Findings of Fact, Conclusions of Law, Orders and Judgment of Custody, April 5, 2021, Paragraph 59.

with the other parent and seeks to control the other parent's behavior." *Barnett v. White*, 584 S.W.3d 755, 761 (Ky. App. 2019) (citing *Squires v. Squires*, 854 S.W.2d 765, 768-69 (Ky. 1993)).

This case's lengthy history clearly shows the parties are unable to work together to successfully co-parent this child. The family court did not abuse its discretion in awarding Jill sole custody.

## CHILD SUPPORT CALCULATION
## STANDARD OF REVIEW

Appellate review of a child support award is governed by the abuse of discretion standard. *Holland v. Holland*, 290 S.W.3d 671, 674 (Ky. App. 2009). "The test for an abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound reasonable principles." *Penner*, 411 S.W.3d at 779-80. Appellate review of a trial court's factual findings is governed by the clearly erroneous standard; factual determinations supported by substantial evidence will not be disturbed. *Truman v. Lillard*, 404 S.W.3d 863, 868 (Ky. App. 2012). In evaluating abuse of discretion, this Court reviews legal conclusions applied by the trial court *de novo*. *Ehret v. Ehret*, 601 S.W.3d 508, 511 (Ky. App. 2020).

## ANALYSIS

Ben alleges the family court erred in its award of child support, both on a temporary basis and the amount going forward post-trial. Ben's first

contention is the family court erred in calculating temporary child support in its October 21, 2019, Order. While Ben attached the Findings of Fact, Conclusions of Law and Orders dated October 21, 2019, to his brief, he did not designate the record to include the October 8, 2019, hearing in which the family court heard the evidence to form the basis of this temporary order.

There is very little in the record before us surrounding this timeframe, as it appears that filings were still being filed in the "J" case. No filings with the "J" case number were included in the record. "Consequently, if consideration of the transcript of evidence is necessary to the determination of the issue raised by appeal, and the transcript of evidence is not designated for inclusion in the record, the appellate court finds itself unable to resolve the issue because the record is insufficient, and the appeal must be dismissed." *Oldfield v. Oldfield*, 663 S.W.2d 211, 212 (Ky. 1983).

We are unable to determine from the record if an error was committed as to the temporary decision, so this initial ruling will not be reviewed. If the record is incomplete, the reviewing court must assume the omitted portions support the trial court's decision. *Commonwealth, Dep't of Highways v. Richardson*, 424 S.W.2d 601, 603 (Ky. 1967). This was a temporary order, and we must still review the eventual final child support decision for which we have the record.

-35-

Ben argues he was entitled to the "shared parenting" credit after the family court's June 9, 2020, Order which granted him additional parenting time. Ben believes he was entitled to a modification of his child support at that time. The family court's order of June 9, 2020, increased Ben's parenting time of L.D. to where he has visitation every other weekend, one weeknight overnight, and one evening during the week. Even so, this order did not change the award of sole custody to Jill.

"[A] modification of support is wholly within the discretion of the trial court." *Holland,* 290 S.W.3d at 675. While the order of June 9, 2020, did increase Ben's parenting time of L.D., it did not make the timesharing equal. Ben cites no authority to indicate he is entitled to the "shared parenting" credit regarding child support when the timesharing is not equal. Further, a family court's failure to consider the amount of time a parent spent with their children when determining child support has been found not to be an abuse of discretion. *McFelia v. McFelia*, 406 S.W.3d 838, 841 (Ky. 2013). We do not find the family court abused its discretion in declining to decrease Ben's child support obligation when the amount of parenting time was altered (temporarily) in his favor.

Then Ben argues the family court erred in calculating his child support obligation in its final April 5, 2021, Order. He alleges the family court

-36-

used incorrect income information for both him and Jill, and subsequently, that it erred in not employing the child support guidelines.

Ben alleges the family court used incorrect income information for both parties. The family court found Ben had an earning **capacity** of $200,000 per year. Ben argues the family court should have used the $95,951.00 figure that was reported on his 2020 tax return. The 2020 tax return was not provided as evidence during the hearing. Ben attempted to introduce it later in his Motion to Alter, Amend, or Vacate, filed on April 15, 2021, and he attached it as an exhibit. The family court struck this from the record by an order dated May 6, 2021. "[A] party cannot invoke CR 59.05 to raise arguments and to introduce evidence that should have been presented during the proceedings before the entry of the judgment." *Gullion v. Gullion*, 163 S.W.3d 888, 893 (Ky. 2005).

The family court based its finding on Ben's 2019 tax return, which showed income of $201,957. Ben claims $80,000 of that total was a return of capital from his separation from the law firm where he was previously employed. Ben's CPA testified on his behalf, and he testified $77,697 was return of capital. The CPA also testified that this information came directly from Ben and the other law partners. The CPA testified he had not seen any type of document that showed proof of that. Ben did not introduce any additional evidence illustrating what that amount was during the hearing.

-37-

The family court was determining earning capacity based on evidence of past documented income. Regardless of the argument over the basis of the 2019 tax return numbers, the family court was not required to ignore the evidence of income much greater than $200,000 per year in recent prior years. It was not clearly erroneous for the family court to have found this amount as Ben's income for the child support determination.

Ben additionally argues the family court erred in finding Jill's annual income to be $72,641. He claims because Jill did not work full-time, the court should use the amount she would earn if she worked full-time. KRS 403.212(3)(e)1. states, "If there is a finding that a parent is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income, except that a finding of voluntary unemployment or underemployment and a determination of potential income shall not be made for a parent who . . . is caring for a very young child, age three (3) or younger, for whom the parents owe a joint legal responsibility." L.D. was less than two (2) years of age at the time of the hearing. Therefore, the family court did not err in finding Jill's income to be accurate, even if she only worked part-time at the time of the hearing.

Based on those income amounts, the parties' monthly income exceeded the child support guidelines that existed at the time of the hearing. "The

family court may use its judicial discretion to set child support outside the guidelines in circumstances where combined adjusted parental gross income exceeds the uppermost level of the guidelines." *Ciampa v. Ciampa*, 415 S.W.3d 97, 99 (Ky. App. 2013). The family court used the budget introduced into evidence by Jill, since Ben did not tender any evidence regarding L.D.'s needs.

"Having determined that the parental income of the parties was outside the child support guidelines, the family court may use its discretion to set the child support amount outside the guidelines as long as it justifies the deviation in writing." *Id.* at 99-100. The family court in this instance made detailed written findings of its reasoning for how it reached the child support amount it did. We do not find the family court's findings clearly erroneous, or that the family court abused its discretion in determining the proper child support amount.

We recognize Ben's earning capacity presently may have been impaired because of his actions and current licensure status. Jill's earning capacity may also have changed. As indicated by the family court judge at the motion hour on May 18, 2021, Ben is welcome to file a motion to modify child support and attach his most recent tax returns and other evidence of his actual earning capacity if Ben feels the current amount to be incorrect. But that is a matter for the Kenton Family Court, not this Court, to determine anew.

## ALLEGATION OF PROCEDURAL DEFECTS
## STANDARD OF REVIEW

A trial court's procedural and evidentiary rulings are reviewed for abuse of discretion. *Woodard v. Commonwealth*, 147 S.W.3d 63, 67 (Ky. 2004). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair or unsupported by sound legal principles." *Id.*

## ANALYSIS

Ben takes issue with the family court using many of Jill's proposed findings of fact in its order. There is no prohibition for this practice. *Bingham v. Bingham*, 628 S.W.2d 628 (Ky. 1982). "[T]he delegation of the clerical task of drafting proposed findings of fact and conclusions of law under the proper circumstances does not violate the trial court's responsibility." *Id.* at 629. While the court did accept many of Jill's proposed findings of fact, it did not adopt them entirely. We find the family court properly exercised its fact-finding duty outlined in CR 52.01.

Ben makes two other claims of "procedural defects in the proceedings" that he argues constitute reversible error. The first alleged error is that the family court failed to hear motions relevant to the hearing prior to the start

of the hearing.  The second alleged error is that the family court committed reversible error in admitting summary evidence under KRE[14] 1006.

Ben alleges several motions were pending on the date of the hearing that were not addressed prior to the start of the hearing on February 22, 2021.  We find no merit in this argument.  Prior to the start of the hearing, the family court heard **nine** motions *in limine* filed by Ben.  The family court heard and ruled on Ben's pretrial motions for one hour prior to beginning the case.  After the final motion was heard, the family court judge inquired as to whether all preliminary matters had been heard, and both sides responded they had.

Ben references two motions in his brief upon which the family court supposedly failed to rule prior to the hearing.  The first is a Motion for Sanctions for Violations of the Rules of Professional Conduct, filed December 31, 2020.  It was put on the motion docket for January 12, 2021.  This motion asked the family court to prohibit Jill and her counsel from misrepresenting his mental health, sanction them for making misrepresentations to the court regarding his mental health, and for an award of attorney's fees.

A review of the proceedings on that court date shows multiple motions were heard, but Ben's counsel did not bring up this particular motion.  The court did take up a similar motion prior to the start of the hearing.  Ben filed a motion in

---

[14] Kentucky Rules of Evidence.

limine to exclude any evidence regarding his mental health. The court overruled this motion, as mental health of the parents is a crucial element in every custody case. The court thus had ruled on the relevant portion of Ben's motion prior to the hearing. Whether the court was going to sanction Jill and/or her counsel for any statements made is not relevant to the actual substance of the hearing. Therefore, we conclude the family court committed no error in this regard or any error in not ruling on this overlapping motion had to be harmless error.

"An error is harmless where, considering the entire case, the substantial rights of the defendant are not affected or there appears to be no likely possibility that the result would have been different had the error not occurred." *Greene v. Commonwealth*, 197 S.W.3d 76, 84 (Ky. 2006).

The second motion Ben references in his brief is a Motion to Correct the Record and to Alter, Amend or Vacate the Court's July 10, 2020 order, in part, Pursuant to CR 59.05 and CR 60.02, on Grounds of Factual Impossibility. The body of this motion is asking the court to vacate its order to produce Dr. Connor's report. This motion was essentially moot by the time the hearing occurred, as the report had been produced.

Additionally, while the motion is titled "Motion to Correct the Record," there is no reference in the motion as to what exactly in the record Ben is moving to correct. The motion noticed it to be heard on July 28, 2020. This

-42-

motion hour was not included in our record for review, so it cannot be determined if this motion was argued or ruled upon at that time. In any event, there was no error in ordering the production of Dr. Connor's report. In effect, the family court *sub silentio* denied Ben's motion to reverse its course as to the report with the testimony of Dr. Connor being considered during the hearing with each side having the opportunity to question him about his conclusions. We again find this to be harmless error, if in fact it was an error at all.

During the video record cited in his brief, Ben stated the family court had multiple motions pending for a long period of time. He specifically referenced a motion regarding his allegations that evidence had been altered. The judge addressed Ben's concerns and stated if Ben had any evidence of tampered evidence being entered for admission, he should make those objections when the allegedly altered evidence is presented. Ben brought up another motion regarding a proposed order, and the family court judge advised Ben that the motion had already been overruled. We conclude there were no motions not ruled upon which would justify reversal.

Ben's next allegation of error is that the family court erred in allowing summary evidence under KRE 1006. KRE 1006 states:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. A party intending to use such a summary

must give timely written notice of his intention to use the summary, proof of which shall be filed with the court. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Ben alleges the summaries introduced by Jill at the hearing were inadmissible hearsay. Ben does not identify any specific summary that should be considered inadmissible hearsay but indicates in his brief that all of Jill's summaries should have been excluded. The summaries and admitted exhibits consist of text messages, emails, and voicemails between the parties. Ben never claimed he did not write or send these emails or messages. These statements would qualify as a statement of a party offered against that party and thus outside the hearsay rule.

KRE 801A(b) states, "Admissions of parties. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is: (1) The party's own statement, in either an individual or a representative capacity[.]"

Ben does not allege Jill and her counsel did not follow the procedural requirements of KRE 1006. They gave Ben timely written notice of their intention to use summaries and the entirety of the summarized evidence was provided to Ben. Further, Ben complained these summaries were incomplete and painted an unfair picture. However, there was no ruling to prevent Ben from entering the entirety of

the written communications between the parties. In fact, Ben did enter very large portions of the parties' written communications. We rule the family court did not abuse its discretion in admitting Jill's summary evidence.

## DENIAL OF POST-TRIAL MOTIONS WITHOUT A HEARING
## STANDARD OF REVIEW

"The standard of review of an appeal involving a CR 60.02 motion is whether the trial court abused its discretion." *White v. Commonwealth*, 32 S.W.3d 83, 86 (Ky. App. 2000).

## ANALYSIS

Ben alleges fraud affected these proceedings. "The type of fraud affecting the proceedings necessary to justify reopening under CR 60.02(d) generally relates to extrinsic fraud . . . . Extrinsic fraud covers 'fraudulent conduct outside of the trial which is practiced upon the court, or upon the defeated party, in such a manner that he is prevented from appearing or presenting fully and fairly his side of the case.'" *McMurry v. McMurry*, 957 S.W.2d 731, 733 (Ky. App. 1997) (citation omitted).

Ben makes several claims of fraud regarding this hearing. First, he claims the timing of the family court's order infers that the family court judge did not have time to fully read the post-trial briefs and review the evidence before rendering a decision and drafting the order. The hearing took place over five days

and concluded on March 11, 2021. The parties were to file their final memoranda on March 29, 2021, at 3:00 p.m. The final Order was issued on April 5, 2021.

We find no merit to this argument. While it is certainly possible the family court had drafted portions of the final order prior to reading the parties' final memoranda, there is no indication that he did not fully review the evidence. The timing of the order is no indication of fraud. "Whether the trial judge had prepared a tentative draft of a final judgment prior to the formal sentencing did not affect the fact that he heard and considered the evidence and the arguments before entering a final sentencing judgment." *Bussell v. Commonwealth*, 882 S.W.2d 111, 114-115 (Ky. 1994).

Ben further claims the family court's April 5 Order recycles findings of fact from a different case. Again, we find no evidence of fraud, even assuming this assertion to be true. This case and the matter between Ben and his ex-wife involve several of the same actors. Obviously, Ben is a party in both cases. Several of the same witnesses appeared and testified in both cases. Both cases are custody cases in which the same issues are addressed. It is not unexpected to have similar findings of fact when this many similarities between the cases exist.

Ben also points to the fact the order was signed by the judge and entered by the Circuit Clerk's office on the same day as evidence of fraud. He alleges this has never occurred before during the life of this litigation. The fact of

a clerk entering an order when signed by the judge is nothing more than prompt attention to the clerk's duty. Ben does not explain how the prompt entry somehow changed anything by some fraudulent device.

Ben also alleges Jill and her counsel have perpetuated fraud because of a statement to the effect some of the issues were "already decided." Ben points to a police report he filed with the Ft. Mitchell Police Department in May 2019. This issue was addressed in the hearing, and Detective Stulz testified neither she nor the Commonwealth's Attorney determined there was an actionable case in these allegations. Ben's then counsel, Katy Lawrence, filed an affidavit stating that Jill's counsel said to her, "It has already been set that my client will get sole custody."[15] Ben's motion to alter, amend, or vacate regarding this issue was heard on May 18, 2021. The family court judge referenced the affidavit of Ms. Lawrence. Ms. Lawrence appeared on Ben's behalf. She asked the family court for an evidentiary hearing, but when pressed by the family court judge as to what the new evidence is she references in her affidavit, Ms. Lawrence declined to explain any further.

First, there is no right to an evidentiary hearing on a CR 60.02 motion. *Gross v. Commonwealth*, 648 S.W.2d 853, 856 (Ky. 1983). "The burden of proof

---

[15] Exhibit H, Paragraph 6 of Respondent's Motion to Alter, Amend, or Vacate this Court's Order of April 5, 2021, Pursuant to CR 59.05, filed 4/15/2021.

in a CR 60.02 proceeding falls squarely on the movant to 'affirmatively allege facts which, if true, justify vacating the judgment and further allege special circumstances that justify CR 60.02 relief.'" *Foley v. Commonwealth*, 425 S.W.3d 880, 885 (Ky. 2014) (citation omitted). "It is well established that evidentiary inferences are required to be based upon reasonable deductions . . . . Indeed, mere speculation or conjecture has never been a sufficient basis to support an evidentiary inference." *Id.* at 887.

We do not believe the family court abused its discretion in denying an evidentiary hearing on Ben's motions. Most of his assertions, even if true, do not rise to the level of fraud. The pleadings with assertions that could possibly involve fraud do not contain any admissible evidence, merely vague assertions, and hearsay that Jill's counsel gets special treatment by the court. The only evidence presented is Ms. Lawrence's affidavit, which the family court reviewed. The alleged circumstances in the affidavit had been referenced in evidence during the initial hearing. The family court did not find the allegation credible, or that it rose to the level of necessitating an evidentiary hearing.

### 2022-CA-00315-MR:  ORDER OF MARCH 14, 2022

Ben additionally appeals from an Order dated March 14, 2022, issued by Special Judge Brown. Ben first argues the family court abused its discretion in

-48-

its modification of his visitation with L.D. The family court decreased his visitation to four hours per week and required the visitation to be supervised.

## FACTUAL AND PROCEDURAL HISTORY

On November 2, 2021, Ben posted a video to Facebook which led to the Kentucky Supreme Court Inquiry Commission filing a Petition for Temporary Suspension of his law license. This video contained threats to Jill's attorney and the family court staff attorney, who Ben mentions by name. The video alleged the court was corrupt. It contained a litany of profanity. The Petition by the Inquiry Commissioner was filed on November 12, 2021, and a supplement was filed on December 29, 2021.

On November 4, 2021, after viewing the video, Judge Mehling issued an Order of Recusal in the circuit court action. Based on the video, the findings of fact contained in the order issued by Judge Mehling on April 5, 2021, statements by Jill's counsel, a bar complaint filed by one of Ben's former clients, and Ben's offered rationalization for making the video, the Inquiry Commission found probable cause to believe that Ben is a threat to his clients or the public and/or he is mentally disabled and lacks the mental fitness to continue to practice law. The Kentucky Supreme Court suspended Ben's law license on February 24, 2022. In the Order, Ben was required to submit to a full psychological exam within 90 days.

On February 24, 2022, Jill filed an emergency motion. In this motion,

Jill asked the family court to suspend Ben's parenting time with L.D. or in the alternative, to require his parenting time to be supervised until such time as he completed the psychological evaluation required by the Kentucky Supreme Court's order.

Special Judge Brown was assigned to the family court circuit case on December 15, 2021, after Judge Mehling recused himself. The family court first heard the motion on February 25, 2022. From what we can tell, no video recording of this initial hearing was made, so we were unable to review it. The family court temporarily granted Jill's motion to modify. The family court's temporary order required Ben's parenting time to be supervised, pending a full hearing on the issue on March 3, 2022, less than one week later.

On March 3, 2022, the family court held a full evidentiary hearing, which is in the record before us. Jill again called Dr. Connor as a witness. He testified he reviewed eleven videos Ben posted on his Facebook page, including the video of November 2 which was partially the basis of the Supreme Court's suspension order. Dr. Connor also testified he reviewed the Supreme Court's suspension order, the family court's April 5, 2021, Order, Judge Mehling's Recusal Order, and a video taken by Ben's oldest daughter, which shows him texting with both hands while driving for approximately three minutes with the children in the vehicle. Dr. Connor testified all this together, along with his former evaluations of

-50-

Ben, indicates that Ben may be deteriorating mentally. He stated these actions illustrate Ben's reactionary and impulsive behaviors, which could be a cause for concern of L.D.'s safety. Dr. Connor testified he does not believe that Ben's parenting time with L.D. should be suspended, but it should be supervised to ensure L.D. is safe.

Jill testified next. She stated the videos concern her because they show that Ben is surrounded by conflict and that he lacks impulse control. She is worried about L.D. becoming the target of Ben's behavior. She was especially concerned based on L.D.'s young age, which at the time of the hearing, was a month shy of three years old. Jill stated that Ben had two sides, the one he usually showed publicly, and the private side, which she knew could be angry and abusive. She testified these videos show how he acted in private, and she was afraid he was spiraling out of control because he didn't usually let that side show publicly.

Ben called Joanne Roth-Schumate and Adrienne Hundemer as witnesses. Ms. Roth-Schumate is Ben's aunt, and Ms. Hundemer is the mother of a friend of his daughter. Both testified Ben is a great dad, and that neither have any concerns about him as a parent or a caretaker.

Ben testified next. He stated he has been seeing his psychiatrist for years, and he has never been diagnosed with a mental health disorder, other than ADHD, for which he is prescribed Adderall. He testified there had never been any

-51-

issues with his parenting time, and neither mother had expressed any concerns to him. He stated nothing had occurred recently, other than the Supreme Court suspending his license. He argues the events concerning the suspension happened a while ago.

Ben further stated that because he has his other kids, making his time with L.D. supervised would not be workable. He claimed his other children would not be able to see L.D. if his time was supervised. He stated he was concerned about disruption in L.D.'s schedule. He testified he regrets that the videos were "misconstrued," and that he has learned a lot about campaigning from this experience. He stated several times during his testimony that he was running for family court judge, and these videos were part of his message to the public. He claimed he never intended for anyone in the court system to see these videos.

The family court issued a written order on March 14, 2022. This order contained 48 findings of fact. The family court granted Jill's motion to modify the parenting schedule. The family court stated: "The court concludes Respondent's pattern of behavior would seriously endanger the child's mental and emotional health if his parenting time were to remain unsupervised."[16] The family court ordered Ben to have parenting time two days per week, for a period of two

---

[16] March 14, 2022 Order, page 14.

hours per visit, to be supervised at Holly Hill.[17] The order stated, "This order shall remain in effect until modified by subsequent order."[18] The order additionally required Ben to enroll in therapy immediately with a licensed provider who has experience treating narcissistic personality disorders. On March 18, 2022, Ben filed an emergency motion to stay enforcement or to alter, amend, or vacate the March 14 Order. He filed a supplemental motion on March 22, 2022. All these motions were denied. Ben then filed this appeal.

## STANDARD OF REVIEW

A trial court's determinations as to visitation are reviewed for abuse of discretion. *Drury v. Drury*, 32 S.W.3d 521, 525 (Ky. App. 2000). "The test is not whether we as an appellate court would have decided the matter differently, but whether the trial court's rulings were clearly erroneous or constituted an abuse of discretion." *Moore v. Moore*, 626 S.W.3d 535, 539 (Ky. 2021). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair or unsupported by sound legal principles." *Woodard*, 147 S.W.3d at 67. A finding of fact is clearly erroneous if not supported by substantial evidence, which is evidence sufficient to induce conviction in the mind of a reasonable person. *Asente*, 110 S.W.3d at 354. We review a family court's legal

---

[17] A residential facility that offers supervised visitation for nonresidential parents.

[18] March 14, 2022 Order, page 15.

conclusions under the *de novo* standard.  *Brewick v. Brewick*, 121 S.W.3d 524, 526 (Ky. App. 2003).

## ANALYSIS

Ben argues the family court abused its discretion in modifying his visitation with L.D.  A motion to modify timesharing is governed by KRS 403.320(3).  *Pennington v. Marcum*, 266 S.W.3d 759, 765 (Ky. 2008).  This statute states:  "The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral or emotional health."  KRS 403.320(3).

Ben argues the family court erred in both its temporary restriction, ordered February 25, and in its indefinite restriction, ordered March 14.  He argues the temporary restriction was an abuse of discretion because he was not granted a hearing and an opportunity to be heard prior to having his visitation restricted. While we are unable to view the court hearing that occurred on February 25, this was a temporary, interlocutory order and thus not subject to review as a separate appeal.  *See Hook v. Hook*, 563 S.W.2d 716, 717 (Ky. 1978).  At any rate, the family court set a full hearing date for a week later, on March 3, in order to give

Ben the hearing to which he was entitled. *See McNeeley v. McNeeley*, 45 S.W.3d 876, 877 (Ky. App. 2001).

Ben further argues the family court's order is erroneous as a matter of law because the court's consideration of his mental health is a violation of his due process rights. This argument has no merit. A parent's mental health is always a factor in custody determinations regarding the best interests of a child. KRS 403.270(2)(f). Ben argues the record regarding his mental health is incorrect, and specifically points to a court order of October 21, 2019, stating that Ben had been diagnosed with bipolar disorder. That previous order is largely irrelevant to the current order. The order of March 14 does not reference this alleged prior diagnosis in any way. Whether Ben is or has been diagnosed with bipolar disorder is not controlling, as it is not required for the family court to confirm a specific diagnosis to find Ben has mental health issues impacting custody or visitation. While the order does go into some of the history of the case, it ties Ben's current behavior to testimony and evidence that had previously been entered into the record to make the finding that Ben's actions present an existing high risk of seriously endangering the child's mental and emotional health.

Ben argues the family court erred because his experts came to different conclusions than Jill's experts regarding his mental health, and the family court accepted the testimony and reports of Jill's experts over his. "A family court

operating as finder of fact has extremely broad discretion with respect to testimony presented and may choose to believe or disbelieve any part of it. A family court is entitled to make its own decisions regarding the demeanor and truthfulness of witnesses, and a reviewing court is not permitted to substitute its judgment for that of the family court, unless its findings are clearly erroneous." *Bailey v. Bailey*, 231 S.W.3d 793, 796 (Ky. App. 2007). "As the factfinder, it is the trial court's prerogative to make findings of fact according to its own weighing of the evidence." *Cabinet for Health & Fam. Servs. v. L.G.*, 653 S.W.3d 93, 101 (Ky. 2022). It is the factfinder's "prerogative to weigh the credibility of the various experts and decide whose opinions to accept and whose to reject." *Miller ex rel. Monticello Banking Co. v. Marymount Med. Ctr.*, 125 S.W.3d 274, 278 (Ky. 2004).

Ben additionally asserts he was not granted an adequate hearing, and relies on *Deleo v. Deleo*, 533 S.W.3d 211 (Ky. App. 2017). Ben is correct in that to restrict a parent's visitation with their minor child, a hearing is required. *Smith v. Smith*, 869 S.W.2d 55, 56 (Ky. App. 1994). However, *Deleo* is distinguishable from this case. In *Deleo*, the children's mother was denied the continuance she requested to obtain counsel, which led to her being unrepresented at her hearing. This Court found the trial court's denial of the continuance to be an abuse of discretion. Ben was represented by counsel at his hearing, and he also represented

himself *pro se*, himself being an attorney, albeit one with a suspended law license at the time of the hearing. There is no evidence in the record that Ben requested a continuance. Additionally, in *Deleo*, the trial court failed to include a finding in its order that unsupervised visitation with mother would endanger the child. That finding is not missing in this case.

Ben is also correct in his assertion that the burden was Jill's to show that visitation with Ben would endanger L.D. *Smith*, 869 S.W.2d at 56. He is again correct that, per KRS 403.320(3), to support restricting a parent's visitation, any endangerment must be serious. He argues the family court did not hear evidence to support its finding on this. We disagree.

Ben cites *Ryan v. Ryan*, 473 S.W.3d 637 (Ky. App. 2015), in his brief. We conclude *Ryan* is again distinguishable from the case at hand because the trial court in *Ryan* made no determination that visitation would endanger seriously the child's physical, mental, moral, or emotional health. *Id.* at 640. The family court in this action did make the requisite finding that unsupervised visitation would seriously endanger L.D.'s mental and emotional health. "[A] family court's factual findings are reviewed for clear error. CR 52.01. A finding supported by substantial evidence is not clearly erroneous." *Id.* at 641. We do not believe the family court's findings here were clearly erroneous. There was sufficient evidence presented to find that Ben's ongoing behavior would seriously endanger L.D.

-57-

## CONCLUSION

The Kenton Family Court had jurisdiction in this case. The family court's findings of fact are supported by the evidence and are not clearly erroneous. The family court committed no error of law and properly acted within its discretion. The Kenton Family Court is AFFIRMED on all three appeals.

ALL CONCUR.


ENTERED: _June 16, 2023_____      _Kelly Mark Easton_____
                                        JUDGE, COURT OF APPEALS




BRIEFS FOR APPELLANT:                BRIEF FOR APPELLEE:

Benjamin G. Dusing, *pro se*         Stephanie Dietz
Fort Wright, Kentucky                Edgewood, Kentucky

Brandy K. Lawrence
Fort Wright, Kentucky